UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SAFE HARBOR RETREAT, LLC,

               Plaintiff,                  MEMORANDUM AND ORDER

    -against-                       CV 14-2017 (LDW) (GRB)

TOWN OF EAST HAMPTON, NEW YORK,
*et al.*,

               Defendants.
-----------------------------------------------------------X
WEXLER, District Judge

     Plaintiff Safe Harbor Retreat, LLC ("Safe Harbor") brings this action for alleged

violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Americans

with Disabilities Act ("ADA"),  42 U.S.C. § 12101 *et seq.*, against defendants Town of

East Hampton (the "Town") and the Town's Zoning Board of Appeals ("ZBA").

Defendants move to dismiss the complaint pursuant to Federal Rules of Civil Procedure

("FRCP") 12(b)(1) and 12(b)(6).  Safe Harbor opposes the motion.[1]


I.  BACKGROUND

    For purposes of this decision, the complaint can be summarized as follows.  In

December 2009, Safe Harbor founder Joseph McKinsey ("McKinsey") met with

then-Town Supervisor William Wilkinson ("Supervisor Wilkinson") to discuss a

---

[1]Although Safe Harbor has requested oral argument, the Court finds that oral argument is
not necessary for determination of the motion.

proposed "executive retreat" for persons suffering from alcoholism and other forms of

substance abuse.  Complaint ¶ 19.  Safe Harbor proposed locating the retreat at 26 Bull

Run, East Hampton (the "Premises"), placing it in an A-3 zoning district.  *Id.*; Declaration

of Brian Sokoloff, Esq., dated August 29, 2104 ("Sokoloff Decl."),  Ex. B.  Supervisor

Wilkinson expressed his support and McKinsey was eventually referred to Senior

Building Inspector Thomas Preiato ("BI Preiato").  Complaint ¶ 19.  BI Preiato toured the

Premises in February 2010 and McKinsey detailed the plans for the retreat.  *Id.* ¶ 20, 24.

The following day, McKinsey summarized these plans in a letter to BI Preiato:

> [The residents] will reside in the property as a family unit
> under strict house rules and with 24 hour supervision.  The
> group will live and cook together as a single housekeeping
> unit.  The suggested length of stay is eleven months, as this is
> the length of time that has proven to be most successful as a
> foundation for continued sobriety.  All residents will be
> prescreened and completely detoxified prior to their arrival.
> Any and all psychological treatment will be arranged with
> local professionals at locations zoned for such use.  Residents
> will not be permitted to have their own vehicles.  Finally,
> residents will be introduced to 12 step programs in the area
> and encouraged to use this fellowship as a bridge back to life.

*Id.* ¶ 25.  According to Safe Harbor, this letter constituted a request for a "reasonable

accommodation" under the FHA, and for Safe Harbor's "residents" to be treated as a

"family" as defined by the Town Code.  *Id.* ¶ 26.[2]  McKinsey sent a second letter to BI

---

[2]Section 255-1-20 of the Town Code defines "family" as follows:

    A.  The following shall constitute a family hereunder:

        (1)  Any number of persons occupying a dwelling

Preiato, dated March 1, 2010, providing a written description of the New York State

Office of Alcoholism and Substance Abuse ("OASAS") "community residential services"

designation, the license Safe Harbor was seeking and was ultimately granted later that

------

> unit, provided that all are related by blood, marriage or legal adoption and provided that they live and cook together as a single housekeeping unit; or
>
> (2) Any number of persons not exceeding four occupying a dwelling unit and living and cooking together as a single housekeeping unit, where not all are related by blood, marriage or legal adoption.
>
> B. A group of persons whose association or relationship is transient or seasonal in nature, rather than of a permanent and domestic character, shall not be considered a family.
>
> C. A group of unrelated persons numbering more than four and occupying a dwelling unit shall be presumed not to constitute a family. This presumption can be overcome only by a showing that, under the standards enumerated in § 255-8-50 hereof, the group constitutes the functional equivalent of a family. A determination as to the status of such group may be made in the first instance by the Building Inspector or, on appeal from an order, requirement, decision or determination made by him, by the Zoning Board of Appeals.
>
> D. Persons occupying group quarters, such as a dormitory, fraternity or sorority house or a seminary, shall not be considered a family.

Complaint ¶ 27.

year.  *Id.* ¶ 29.[3]  In a March 4, 2010 letter, BI Preiato determined that Safe Harbor met the

criteria of "functioning as a family unit" pursuant to sections 255-1-20 (Family) and

255-8-50 (Occupancy by a family).  *Id.* ¶ 31.  BI Preiato stated:

> I have researched the Zoning Code and have
> determined that zoning requirements will . . . be met based on
> the content of your letter and our conversations with regards
> to the number of residents.  It is apparent that overcrowding
> issues should not be an issue, nor should the number of
> vehicles pose a problem as you have indicated that the
> residents will not have their own vehicles.

*Id.* ¶ 32 (emphasis omitted).

As a result of BI Preiato's determination, Safe Harbor claims to have expended

significant funds and effort to establish the Premises as a community residence for

individuals in recovery from drug and alcohol addiction.  *Id.* ¶ 36.

In July 2010, three Town officials – Supervisor Wilkinson, Police Chief Eddie

Ecker, and Deputy Town Attorney John Jilnicki ("DTA Jilnicki") –  wrote to OASAS in

---

[3]OASAS defines "community residential services" as:

> chemical dependence residential services providing supervised
> services to persons making the transition to abstinent living.
> Persons appropriate for this service require the support of a drug
> and alcohol-free environment while receiving either outpatient
> services or educational and/or vocational services.  These
> transitional residential services are for individuals who are
> completing or have completed a course of treatment, but who are
> not yet ready for independent living due to outstanding clinical
> issues or unmet needs for personal, social or vocational skills
> development.  These services are appropriate for individuals who
> require ongoing clinical support.

*Id.* ¶ 30.

support of Safe Harbor's licensing application.  Id. ¶ 37.  Safe Harbor received an

OASAS operating certificate effective November 18, 2010.  Id. ¶ 38.  Safe Harbor opened

on November 30, 2010.  *Id.*

Throughout the following spring and summer, various Town officials visited the

Premises, where they were given tours and provided detailed explanations of Safe

Harbor's day-to-day operations.  *Id.* ¶ 39.  The officials complimented the services and

expressed appreciation for the scholarships offered to local residents, and never

mentioned any zoning violations.  *Id.*

In September 2011, Town Attorney Patrick Gunn ("TA Gunn") called Safe Harbor

to advise that a local competitor had complained about the use of the Premises following

a *New York Post* article featuring Safe Harbor.  *Id.* ¶¶ 40-41.  Although Safe Harbor

claims to have strictly adhered to its OASAS license, the complaint prompted some local

residents to complain about Safe Harbor, forming groups, such as Citizens for the

Preservation of the Northwest Woods.  *Id.* ¶ 42.

Shortly thereafter, McKinsey received a letter from BI Preiato, dated September

27, 2011, stating that

> upon further review of operational aspects of your facility,
> namely the providing of on-site addiction treatments and
> services, as well as the transient nature of your client's [*sic*]
> varied residencies at the facility, it is now clear that such an
> operation is not permitted in a residential zone without site
> plan approval.  Your facility could possibly . . . be classified
> as a Semi-Public Facility, which would require administrative
> review for a Special Permit.

*Id.* ¶ 43. The fire marshal sent a letter, dated October 17, 2011, stating that "[i]t has come to our attention that the residence . . . has changed it is [*sic*] use from a pre-existing R-3, single family residence to an R-4 assisted living facility." *Id.* ¶ 45. BI Preiato sent a follow-up letter dated November 2, 2011, stating that "your facility requires a Site Plan Special Permit for the on-site clinical therapy and services currently being provided at the above referenced property as this is a residential district." *Id.* ¶ 46.

By letter dated November 11, 2011, McKinsey responded to BI Preiato's letters, contesting the building inspector's "reversal" of position. *Id.* ¶ 47. McKinsey explained that he had fully and precisely disclosed to the Town "the exact nature of services offered" at Safe Harbor before its doors opened, as well as the OASAS license it sought and ultimately obtained. *Id.* McKinsey's letter was followed by a letter dated November 13, 2011 from Steven G. Polin ("Polin"), an attorney for Safe Harbor, requesting the information that BI Preiato had reviewed in reaching his alleged "reversal" of position, and advising BI Preiato that the Town's proposed actions would have implications under the FHA. *Id.* ¶ 48. The letter renewed McKinsey's "reasonable accommodation" request under the FHA "by continuing to treat the residents of Safe Harbor as a family based upon Mr. BI Preiato's March 4, 2010 determination." *Id.* Safe Harbor received no response. *Id.*

In January 2012, BI Preiato appeared at Safe Harbor to inspect the Premises, but was told to communicate through counsel. *Id.* ¶ 49. Attorney Polin then requested an

explanation from Town officials as to why the Town had not responded to his earlier letter. *Id.* ¶ 49. DTA Jilnicki replied that BI Preiato's position complied with applicable law and that the building inspector would proceed with "appropriate efforts" to enforce the Town Code. *Id.* ¶ 51.

Over the next several months, the Town and Safe Harbor discussed the matter, as Safe Harbor continued to operate at the Premises. *Id.* ¶ 54. By letter dated July 10, 2012, BI Preiato reiterated his position to Safe Harbor that it was operating an unauthorized "Semi-Public Facility, in a residential district," and that, pursuant to Town Code, a "Special Permit" is required. *Id.* ¶¶ 55-56.

Rather than seek a special permit from the Town's Planning Board, Safe Harbor instead filed an "Application" to the Town's ZBA to "appeal" BI Preiato's determination, claiming that its residents continue to be treated as the functional equivalent of a family, apparently to relieve it from special permit and variance requirements of the Town Code. *Id.* ¶ 62. The ZBA held a public hearing on March 12, 2013 on the application. *Id.* ¶ 62. At the hearing, the ZBA heard and/or received: (1) testimony from BI Preiato (supporting his determination); (2) presentations and submissions from Safe Harbor's counsel (supporting Safe Harbor's application) and from counsel for Citizens for the Preservation of the Northwest Woods (opposing Safe Harbor's application); and (3) comments from several members of the public. Sokoloff Decl., Ex. B.

By decision dated June 6, 2013, the ZBA upheld BI Preiato's determination. The

ZBA found that Safe Harbor's use of the Premises was not "consistent with the use as a residence only," and that, while the term "transient" is not used in the Town Code "regarding residential use of a premises," the circumstances of Safe Harbor's operation "strongly indicat[ed]" that Safe Harbor operated as a "short term treatment facility clinic" and not as a residence "as was initially represented to the Town." *Id.* The ZBA concluded that the Premises was being operated as "semi-public facility," which requires a special permit. *Id.*

The ZBA's vice chairperson issued a written dissent, expressing, *inter alia*, his belief that BI Preiato's reversal "fully revoked a prior complete and unconditional approval he had given the applicant . . . on grounds that are not directly or specifically supported by the Town Code" and that BI Preiato acted "arbitrarily in creating new definitions [for terms such as 'transient' and 'clinic'] and capricious in applying them only to this applicant." *Id.* The vice chairperson further believed that the ZBA denied Safe Harbor "a reasonable accommodation to a protected group of disabled individuals acting as a family unit" in violation of the FHA "by adding unnecessary and unjustified new burdens to such a group home." *Id.*

Rather than seek a special permit, Safe Harbor filed this action. Safe Harbor challenges that ZBA's determination, claiming, *inter alia*, that the ZBA: (1) exceeded its authority by creating definitions for terms such as "transient" and "clinic" even though, as the ZBA acknowledged, the Town Code does not define those terms or include them in

the definition of a semi-public facility; (2) ignored material submitted by Safe Harbor at

the hearing; (3) denied Safe Harbor's request for a reasonable accommodation by failing

to address the request; and (4) "arbitrarily, capriciously and illegally reclassif[ied] the

Premises as something other than a single-family use." *Id.* ¶¶ 79, 82, 89, 98; *see id.*

*generally* ¶¶ 77-103.

Defendants move to dismiss the complaint for lack of subject matter jurisdiction

under FRCP 12(b)(1), arguing that the action is not ripe; and, alternatively, for failure to

state a claim under FRCP 12(b)(6).[4]

## II.  DISCUSSION

A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Determining the existence of subject matter jurisdiction is a threshold inquiry,"

*Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), and "a case is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it," *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter

jurisdiction has the burden of proving by a preponderance of the evidence that it exists."

*Id.*  While the court takes all facts alleged in the complaint as true and draws all

---

[4]Because, as discussed below, the Court agrees with defendants that this action is not ripe, the Court need not address defendants' alternative argument that the complaint fails to state a claim under FRCP 12(b)(6).

reasonable inferences in a plaintiff's favor, subject matter jurisdiction "must be shown

affirmatively, and that showing is not made by drawing from the pleadings inferences

favorable to the party asserting it." *Morrison*, 547 F.3d at 170 (quotation marks omitted).

In deciding a FRCP 12(b)(1) motion, the court "may consider evidence outside the

pleadings." *Id.*

B.  Ripeness

Defendants argue that this action is not ripe, relying primarily on the Second

Circuit's recent decision in *Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118

(2d Cir. 2014).  According to defendant's, Safe Harbor is required to obtain a "final

decision" from the Town on its request to operate at the Premises, but that it has failed to

do so because it never applied for a special permit from the Town.  This Court agrees

with defendants that this action is not ripe.

As the Second Circuit has recognized, "[r]ipeness is a doctrine rooted in both

Article III's case or controversy requirement and prudential limitations on the exercise of

judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir.

2005).  The " 'basic rationale [of the ripeness doctrine] is to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract

disagreements.' " *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).

"Determining whether a case is ripe generally requires [the court] to 'evaluate both the

fitness of the issues for judicial decision and the hardship to the parties of withholding

court consideration.' " *Id.* (quoting *Abbott Labs.*, 387 U.S. at 149). The fitness of issues

for judicial review requires "a weighing of the sensitivity of the issues presented and

whether there exists a need for further factual development," whereas the hardship to the

parties requires the court to "gauge the risk and severity of injury to a party that will result

if the exercise of jurisdiction is declined." *Id.* Although the ripeness doctrine does not

require " 'a futile gesture as a prerequisite for adjudication in federal court,' " *Desiderio*

*v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999) (quoting *Williams v.*

*Lambert*, 46 F.3d 1275, 1280 (2d Cir. 1995)), conclusory or unsupported allegations of

futility will not suffice. In a land use context, the so-called "futility exception" is said to

apply when the relevant "agency lacks discretion to grant variances or has dug in its heels

and made clear that all such applications will be denied." *Murphy*, 402 F.3d at 349.

The Supreme Court in *Williamson County Regional Planning Commission v.*

*Hamilton Bank of Johnson City*, 473 U.S. 172 (985), created a two-prong ripeness test for

takings claims premised on municipal land use decisions: (1) that the government entity

rendered a "final decision" on the matter; and (2) that the plaintiff must have "sought

compensation by means of an available state procedure." *Dougherty v. Town of N.*

*Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). Although Safe

Harbor initially argued that the final-decision requirement – the first prong of the

*Williamson County* test – does not apply to discrimination claims under the ADA and

FHA, the Second Circuit in *Sunrise* held that the final-decision requirement extends to

ADA claims, *see Sunrise*, 769 F.3d at 123, and lower courts in this circuit have also

extended it to FHA claims, *see, e.g.*, *Congregational Rabbinical College of Tartikov, Inc.*

*v. Village of Pomona*, 915 F. Supp. 2d 574, 598-99 (S.D.N.Y. 2013) (applying final-

decision requirement to various claims, including FHA claim); *S & R Dev.  Estates, LLC*

*v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y. 2008) ("Courts in this Circuit have also

applied the ripeness doctrine to FHA claims."); *Woodfield Equities, L.L.C. v. Inc. Vill. of*

*Patchogue*, 357 F. Supp. 2d 622, 632 (E.D.N.Y. 2005), *aff'd*, 156 F. App'x 389 (2d Cir.

2005) (failure to apply for variance or special use rendered ADA and FHA claims

unripe).  Indeed, *Sunrise* expressly stated that "a plaintiff alleging discrimination in the

context of a land-use dispute is subject to the final-decision requirement."  *Sunrise*, 769

F.3d at 123.  Although *Sunrise* added that the final-decision requirement does not apply if

the plaintiff "can show that he suffered some injury independent of the challenged

land-use decision" (such as where the plaintiff challenges "a zoning policy that is

discriminatory on its face" or "the manipulation of a zoning process out of discriminatory

animus to avoid a final decision") *id.*, those situations do not apply here.

Moreover, the Second Circuit in *Sunrise* reiterated that "we have previously

interpreted *Williamson County* as 'condition[ing] federal review on a property owner

submitting at least one meaningful application for a variance.' "  *Id.* at 124 (quoting

*Murphy*, 402 F.3d at 348); *see also Congregational Rabbinical College*, 915 F. Supp. 2d

at 598-99 ("Furthermore, even if a plan has been submitted and rejected, a claim is not

ripe until the 'property owner submit[s] at least one meaningful application for a variance.' " (quoting *Murphy*, 402 F.3d at 348)). *Sunrise* further held that to "prevail on a reasonable accommodation claim, 'plaintiffs must first provide the governmental entity an opportunity to accommodate them through the entity's established procedures used to adjust the neutral policy in question.' " *Sunrise*, 769 F.3d at 124 (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578 (2d Cir. 2003)).

Under the circumstances alleged, this action is not ripe. Safe Harbor has not applied for a special permit, let alone received a final decision on that application. Rather, the Town upheld the building inspector's determination that Safe Harbor was operating the Premises as an unauthorized semi-public facility and, as such, needed to apply for a special permit. Given, Safe Harbor's failure to seek a special permit, the Town has not rendered a final decision regarding Safe Harbor's use of its Premises; nor has the Town had the opportunity to make an accommodation through the Town's "established procedures used to adjust the neutral policy in question," namely, special permit and variance procedures. *See id.* Just as in *Sunrise*, "[a] federal lawsuit at this stage would inhibit the kind of give-and-take negotiation that often resolves land use problems, and would in that way impair or truncate a process that must be allowed to run its course." *See id.* The substantial policy and practical reasons for the final-decision requirement are particularly applicable here. This Court's review of plaintiff's FHA and ADA claims without (1) resolution of whether a special permit or variance might provide

the relief Safe Harbor seeks, (2) precise demonstration of how the Town Code will be applied to Safe Harbor's Premises, and (3) development of a full record presents a very real risk of undue interference in " 'matters of local concern more aptly suited for local resolution.' " *Lost Trail LLC v. Town of Weston*, 289 F. App'x 443, 445 (2d Cir. 2008) (quoting *Murphy*, 402 F.3d at 348). Moreover, Safe Harbor has not shown that it will suffer undue hardship by the Court declining jurisdiction at this time or that further recourse through the Town's procedures would be futile.

Accordingly, the Court finds that this action is not ripe. As such, the complaint is dismissed without prejudice.


### III.  CONCLUSION

For the above reasons, defendants' motion to dismiss the complaint as unripe is granted. The action is dismissed without prejudice. The Clerk of Court is directed to close the file.

SO ORDERED.

_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
         March 2, 2015